**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**JONESBORO DIVISION**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAR 1 2 2018

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

JESSICA CHANDLER and ADAM KING,
on behalf of themselves and all others
similarly situated,

Plaintiffs,

v.

Arvest Bank,

Defendant.

Case No.
3:18-cv-00043 DPM

**CLASS ACTION COMPLAINT**

This case assigned to District Judge _MARSHALL_
and to Magistrate Judge_____ _RAY_

Plaintiffs Jessica Chandler and Adam King, on behalf of themselves and all others similarly situated, sue defendant Arvest Bank and allege:

**INTRODUCTION**

1. Plaintiffs seek redress for an improper practice that Arvest Bank ("Arvest") perpetrates against its checking account customers. Plaintiffs assert this action pursuant to Federal Rule 23, on behalf of themselves and all others similarly situated throughout the United States, for damages and other relief arising from Arvest's routine practice of assessing overdraft fees ("OD Fees") on transactions that did not actually overdraw the account.

2. Besides being deceptive, unfair, and unconscionable, the practice breaches promises made in Arvest's contracts, including the promise to charge OD Fees only on transactions which actually overdraw an account.

3. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Arvest immediately makes an internal notation deducting the amount from the account and purportedly setting aside the funds to cover that specific transaction. As a result, and with limited exceptions, customers' accounts *always* have sufficient available funds to cover these transactions throughout their entire life-cycle.

4. However, Arvest still assesses $17 OD Fees on many of these transactions, in violation of its contractual promises not to do so.

5. Despite purporting to put aside sufficient available funds for debit card transactions, Arvest charges OD Fees on those same transactions if they settle—days later—against a negative balance ("Authorize Positive, Purportedly Settle Negative Transactions" or "APPSN Transactions").   *By this manipulation, Arvest turns one potential OD Fee into several.*

6. Here is how it works.   Arvest maintains a running account balance in real time, tracking funds consumers have for immediate use.   This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instant they are made.   When a customer makes a purchase with a debit card, Arvest promises to sequester the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's account balance.   Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

7. Indeed, the entire purpose of the immediate debit and hold of funds is to ensure there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

8. That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has been reduced to account for earlier debit card transactions. This means that subsequent transactions may incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

9. Still, despite keeping those held funds off-limits for other transactions, Arvest improperly charges OD Fees on APPSN Transactions even though, by their very nature, such transactions always have sufficient available funds for payment because the funds have been held and sequestered by Arvest.

10. The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "deceptive" when:

> a financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such

> misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

11. There is no justification for these practices, other than to maximize Arvest's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Arvest is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions— and it does the latter to the tune of millions of dollars each year. But Arvest is not content with these millions in OD Fees. Instead, it seeks millions *more* in OD Fees on APPSN Transactions.

12. In plain, clear, and simple language, the checking account contract documents discussing OD Fees promise that Arvest will <u>only</u> charge OD Fees on transactions when there are insufficient funds to pay a given transaction.

13. The documents also make clear that the moment of a transaction's authorization is the determining time period as to whether a transaction is an "overdraft" or not:

> Once approved for overdraft coverage, we will pay checks and other items that cause your account to go into a negative balance up to the amount of the overdraft limit on your account. There is a $17 fee per item paid into the negative.

> [...]

> Basic Overdraft Coverage pays these items:

> · Checks you write and checks initiated by BillPay online or via our mobile application

· ACH electronic payments for bills automatically deducted from your account

· Recurring debit card transactions, such as a monthly membership or subscription

Basic Overdraft Coverage does not cover everyday debit card transactions or ATM transactions. **These transactions would be declined at the point of sale or at the ATM when there are insufficient funds in your account to complete the transaction.**

[…]

**Decline Overdraft Coverage**

You may determine that you do not want any overdraft coverage at all. If you are concerned about managing your account with the overdraft options previously described, we can remove all coverage. When you decline overdraft coverage, checks and other items presented on your checking account that would cause an overdraft will be returned and you will be assessed a $17 fee for each item when permitted by law. Additional merchant fees may also apply. **We will decline debit card purchases and ATM transactions that would take your account into a negative balance**. If you have authorized a recurring transaction on your debit card, such as a monthly payment, it could overdraw your account and we will charge you a $17 insufficient funds fee for each item presented against insufficient funds, up to a maximum of eight insufficient funds fees per day.

Exhibit 1, Arvest's "Personal Checking Accounts" Disclosure, p. 2 (emphasis added).

14. Arvest's Fee Schedule is more explicit that OD Fees are assessed when created:

A fee will be charged, when permitted by law, **for each overdraft created** by check, ATM withdrawal, in person withdrawal or other electronic means.

Exhibit 2 (emphasis added).

15. Clearest of all is Arvest's Electronic Funds Transfer Agreement, which states:

**Each time you use your Debit Card, the amount of the transaction will be debited from your designated account**. We have the right to return any check or other item drawn against your account **to ensure there are funds available to pay for the Debit Card transactions.**

Exhibit 3, p. 1 (emphasis added).

5

16. For APPSN Transactions, the amounts of which are immediately deducted from a positive account balance and held aside for payment of that same transaction, no overdraft is "created" because there are always funds to pay those transactions—yet Arvest assesses OD Fees on them anyway.

17. In short, Arvest is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

## PARTIES

18. Plaintiffs Jessica Chandler and Adam King are Arvest customers.

19. Ms. Chandler is a resident of the State of Arkansas.

20. Mr. King is a resident of the State of Oklahoma.

21. Arvest is a state bank with its headquarters and principal place of business located in Fayetteville, Arkansas.  Arvest has $16.7 billion in assets and provides banking services to customers through 268 bank branches in the states of Arkansas (117 branches), Oklahoma (99 branches), Missouri (44 branches), and Kansas (8 branches).  Arvest is the largest bank in Arkansas based on total deposits.  Although Arvest is not formally connected to Wal-Mart, the two companies share deep ties.  Members of the Walton family own over 95% of Arvest Bank.  Among other things, Arvest is engaged in the business of providing retail banking services to consumers, including Plaintiffs and members of the putative classes, which includes the issuance of debit cards for use by customers in conjunction with their checking accounts.

## JURISDICTION

22. This Court has original jurisdiction pursuant to the Class Action Fairness Act.

23. Arvest regularly and systematically conducts business and provides retail banking services in this district, and provides retail banking services to customers in this district, including Plaintiffs and members of the putative class.

## VENUE

24. Venue is likewise proper in this district pursuant to 28 U.S.C. § 1391 because Arvest is subject to personal jurisdiction in this Court and regularly conducts business within this district. Thus, a substantial part of the events giving rise to the claims asserted herein occurred and continue to occur in this district.

## OVERVIEW

### A.    Mechanics of a Debit Card Transaction

25. A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Arvest. When a merchant physically or virtually "swipes" a customer's debit card, the card terminal connects, via an intermediary, to Arvest, which verifies that the customer's account is valid and that sufficient funds are present to "cover" the transaction amount.

26. At this step, if the transaction is approved, Arvest immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

27. Once again, the very purpose of the debit hold is to ensure there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the

> time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

28. Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.  This is referred to in the banking industry as "posting" or "settling"—something which usually occurs one to three business days after the transaction was initially initiated.

29. There is no change—no impact whatsoever—to the balance of "available funds" in an account when posting or payment of a transaction that settles in the same amount for which it was authorized occurs.  That is because the amount of the transaction was deducted from available funds at the time of approval.

###    B.    Arvest Account Documents

30. Plaintiffs' checking accounts with Arvest were, at all relevant times, governed by Arvest's standardized contract for deposit accounts, the material terms of which are drafted by Arvest, amended by Arvest from time to time at its convenience and complete discretion, and imposed by Arvest on all of its customers.

31. In plain language the checking account contract documents discussing OD Fees promise that Arvest will only charge OD Fees on transactions causing the account to go into a negative balance:

> Once approved for overdraft coverage, we will pay checks and other items that cause your account to go into a negative balance up to the amount of the overdraft limit on your account.  There is a $17 fee per item paid into the negative.

Exhibit 1, Arvest's "Personal Checking Accounts" Disclosure, p. 2.

32. Even when a customer has no overdraft coverage, only transactions that would cause an overdraft result in an OD Fee:

> When you decline overdraft coverage, checks and other items presented on your checking account that would cause an overdraft will be returned and you will be assessed a $17 fee for each item when permitted by law. Additional merchant fees may also apply. **We will decline debit card purchases and ATM transactions that would take your account into a negative balance.** If you have authorized a recurring transaction on your debit card, such as a monthly payment, it could overdraw your account and we will charge you a $17 insufficient funds fee for each item presented against insufficient funds, up to a maximum of eight insufficient funds fees per day.

*Id.*

33. The Fee Schedule is in accord:

> A fee will be charged, when permitted by law, **for each overdraft created** by check, ATM withdrawal, in-person withdrawal or other electronic means.

Exhibit 2, Arvest Fee Schedule (emphasis added).

34. Such fees cannot occur where the amount of the transaction has been sequestered by Arvest, which is what happens with APPSN Transactions because, as stated in the Electronic Funds Transfer Agreement:

> **Each time you use your Debit Card, the amount of the transaction will be debited from your designated account.** We have the right to return any check or other item drawn against your account **to ensure there are funds available to pay for the Debit Card transactions.**

Exhibit 3, p. 1 (emphasis added).

### C. The Account Documents Misconstrue Arvest's True Overdraft Fee and Debit Processing Practices

35. The account documents do not accurately describe Arvest's true debit card processing and OD Fee practices in at least two ways.

36. First, and most fundamentally, Arvest charges OD Fees on debit card transactions for which there are sufficient available funds.

37. Arvest assesses OD Fees on APPSN Transactions that **_do_** have sufficient funds to pay them throughout their lifecycle.

38. Those available funds are sequestered at the moment a debit card transaction is approved by Arvest.

39. Arvest's practice of charging OD Fees even where sufficient funds exist to pay a transaction violates a contractual promise not to do so.  This discrepancy between Arvest's actual practice and the contract causes consumers like Plaintiffs to incur more OD Fees than they should.

40. Sufficient funds for APPSN Transactions are deducted immediately, consistent with the practice of many banks.

41. Because these deductions take place upon initiation, they cannot be re-debited later.  But that is what Arvest does when it re-debits the account later at the time of posting.

42. In reality, Arvest's actual practice is to reduce the balance for the debit hold for all purposes favorable to Arvest, such as charging OD Fees on other transactions coming in to post, but to then deplete those held funds and still charge an OD Fee for the debit transaction that was subject to the hold.

43. At the time of settlement, however, the available balance *does not change at all* for these transactions previously authorized.  As such, Arvest cannot then charge an OD Fee on such a transaction because the balance has not been rendered insufficient due to the pseudo-event of settlement.

44. This discrepancy between Arvest's actual practices and the contract causes consumers to incur more OD Fees than they should.

45. Second, the bank promises to make overdraft determinations only at the time they are "created," which must be the time the bank elects whether or not to pay an overdraft.

46. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined.  According to the "must-pay" network rule, once Arvest authorizes a debit card transaction, it has no choice but to pay it.  It cannot change its mind later.

47. In short, Arvest promises that it will make overdraft fee determinations at the time of authorization.  That means that APPSN Transactions rightly cannot incur overdraft fees.

48. In sum, there is a yawning gap between Arvest's practices as described in the account documents and Arvest's practices in reality.

### D. Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately

49. The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions.  That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions).  If funds are immediately debited, then they are necessarily available to be applied to the debit card transactions for which they are debited.

50. Arvest was and is aware that this is precisely how its accountholders reasonably understand debit card transactions to work.

51. Arvest well knows that many consumers prefer debit cards for these very reasons.  Consumer research indicates that consumers prefer debit cards as a budgeting device; because they do

not allow debt like credit cards do; and because the money comes directly out of a checking account.

52. Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear."[1]

53. Further, Consumer Action informs consumers: "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full."

54. This is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased exponentially in recent years and, with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[2]

55. Not only have consumers increasingly substituted cash with debit cards, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

---

[1] *See* https://www.consumer-action.org/english/articles/understanding_debit_cards/ (last visited Mar. 2, 2018).
[2] Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases*, MARKETWATCH, Mar. 23, 2016 (available at http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23).

56. Arvest was aware of a consumer perception that debit transactions reduce balances at the time of authorization and its account agreement only supports this perception.

### E. **Plaintiffs' Overdraft Fee Experience**

57. On August 24, 2016 (with fees deducted the next banking day), Plaintiff Chandler was assessed <u>four</u> OD Fees on debit card transactions that were, upon information and belief, initiated on a prior date and at a time when she had sufficient funds in her account to cover the transactions. Pursuant to Arvest's account documents, the funds for each transaction were sequestered in order to pay the items when they posted, but Arvest's software systems were instead programmed to allow the funds to depleted so OD Fees could be assessed.

58. The same pattern occurred on September 19, 2016 (with fees deducted the next banking day), when Plaintiff Chandler was assessed <u>three</u> OD Fees on debit card transactions authorized into a positive balance.

59. It occurred yet again on October 7, 2016 (with fees deducted the next banking day), when Plaintiff Chandler was assessed <u>seven</u> OD Fees, six of which resulted from debit card transactions that were, upon information and belief, initiated on or prior to that date at a time when there was a positive balance in the account. For example, Ms. Chandler was assessed $17 OD Fee based on a $3.20 debit card purchase at Burger King, which was approved by Arvest at a time when her account had a positive balance.

60. On February 21, 2017 (with fees deducted the next banking day), Plaintiff King was assessed <u>two</u> OD Fees, with one OD Fee resulting from a $1.63 Redbox movie rental debit card transaction that was, upon information and belief, initiated at a time when he had a positive balance in his account.

61. The same pattern occurred on March 6, 2017 (with fees deducted the next banking day), when Mr. King was assessed a $17 OD Fee based on a $10 debit card transaction that was approved when he had a positive balance in the account.

62. Plaintiffs dispute that Arvest was authorized to charge OD Fees against debit card transactions that had been subject to debit holds, because the money was supposed to be sequestered and set aside by Arvest.

63. Arvest assessed OD Fees on the held transactions even though it was contractually required to sequester funds for those transactions at the time they were authorized. Arvest's systems and software has been programmed to systematically assess improper OD Fees.

## CLASS ALLEGATIONS

64. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23. The proposed class is defined as:

> All Arvest checking account holders who, within the applicable statute of limitations, were charged an overdraft fee on a debit card transaction that was authorized at the time when the account balance exceeded the amount of the transaction (the "Class").

65. Plaintiffs bring this action on their own behalf and on behalf of all others similarly situated pursuant to Federal Rule 23. Excluded from the class are Arvest, its subsidiaries and affiliates, its officers, directors, the members of their immediate families, and any entity in which Defendant has a controlling interest, to include the legal representatives, heirs, successors, or assigns of any such excluded party. Also excluded are the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

66. Plaintiffs reserve the right to modify or amend the definition of the proposed Class if necessary before this Court determines whether certification is appropriate.

67. This case is properly brought as a class action under Federal Rule 23(a) and (b)(3), and all requirements therein are met for the reasons set forth in the following paragraphs.

68. *Numerosity under Fed. R. Civ. P. 23(a)(1)*. The members of the Class are so numerous that separate joinder of each member is impracticable. Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to Arvest's records. Through the evaluation of Arvest's data, it is possible to identify all members of the Class and the amount of improper OD Fees paid by each Class member. Such specific information is not otherwise available to Plaintiffs, but must be maintained pursuant to federal law, and is subject to suitable discovery.

69. *Commonality under Fed. R. Civ. P. 23(a)(2)*. There are numerous questions of law and fact common to the Class relating to Arvest's business practices challenged herein, and those common questions predominate over any questions affecting only individual Class members. The common questions include, but are not limited to:

    a)    Whether Arvest improperly charged overdraft fees on APPSN Transactions; and

    b)    Whether Plaintiffs and other members of the Class have sustained damages as a result of Arvest's assessment and collection of the OD Fees, and the proper measure of damages.

70. *Typicality under Fed. R. Civ. P. 23(a)(3).*  Plaintiffs' claims are typical of the claims of the other Class members in that they arise out of the same wrongful business practice by Arvest, as described herein.

71. *Adequacy of Representation under Fed. R. Civ. P. 23(a)(4).*  Plaintiffs are adequate representatives of the Class in that they have Arvest checking accounts and have suffered damages as a result of Arvest's assessment and collection of OD Fees.  In addition:

   a)   Plaintiffs are committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers against financial institutions;

   b)   There is no hostility of interest between Plaintiffs and the unnamed Class members;

   c)   Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

   d)   Plaintiffs' legal counsel have the financial and legal resources to meet the substantial costs and legal work associated with this type of litigation.

72. *Predominance under Fed. R. Civ. P. 23(b)(3).*  The questions of law and fact common to the Class as set forth in the "commonality" allegation above predominate over any individual issues.  As such, the "commonality" allegations are restated and incorporated herein by reference.

73. *Superiority under Fed. R. Civ. P. 23(b)(3).*  A class action is superior to other available methods and highly desirable for the fair and efficient adjudication of this controversy.  Since

the amount of each individual Class member's claim is very small relative to the complexity of the litigation and since the financial resources of Arvest are enormous, no Class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the Class members will continue to suffer losses and Arvest's misconduct will proceed without remedy. In addition, even if Class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

74. All conditions precedent to bringing this action have been satisfied and/or waived.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract)**
**(On Behalf of the Class)**

75. Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

76. Plaintiffs and Arvest have contracted for bank account deposit, checking, ATM, and debit card services.

77. Arvest mischaracterized in the account documents its true debit card processing and OD Fee practices and breached the express terms of the account documents.

78. Arvest breached promises included in the account documents.

79. No contract provision authorizes Arvest to charge OD Fees on APPSN Transactions. Rather, the contract only authorizes Arvest to charge OD Fees on transactions for which sufficient funds did not exist at the time of authorization.

80. Therefore, Arvest breached the terms of its account documents by charging OD Fees on transactions that were authorized at a time when sufficient funds were present in the account and a debit hold for the amount of funds was put in place. Through account manipulations that were no fault of the customer, an allegedly insufficient balance was concocted when the transactions were settled, resulting in an improper OD Fee.

81. Plaintiffs and members of the Class have performed all, or substantially all, of the obligations imposed on them under the account documents.

82. Plaintiffs and members of the Class have sustained damages as a result of Arvest's breach of the contract.

### SECOND CLAIM FOR RELIEF
**(Breach of the Covenant of Good Faith and Fair Dealing)**
**(On Behalf of the Class)**

83. Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

84. Plaintiffs and Arvest have contracted for bank account deposit, checking, ATM, and debit card services, as embodied in the account documents.

85. Under the law of Arkansas, Kansas, Missouri, and Oklahoma good faith is an element of every contract pertaining to the assessment of OD Fees. Good faith is also mandated by the Uniform Commercial Code ("UCC") which has been adopted by all four states. Whether by common law or statute, all contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not

18

merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

86. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

87. Arvest has breached the covenant of good faith and fair dealing in the contract through its overdraft policies and practices as alleged herein.

88. Specifically, Arvest harms consumers by abusing its contractual discretion in a number of ways which no reasonable customer would anticipate.

89. Arvest uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume funds previously sequestered for APPSN Transactions.

90. Arvest uses this contractual discretion to extract OD Fees on transactions that no reasonable consumer would believe could cause OD Fees.

91. Plaintiffs and members of the Class have performed all, or substantially all, of the obligations imposed on them under the account documents.

92. Plaintiffs and members of the Class have sustained damages as a result of Arvest's breach of the covenant of good faith and fair dealing.

## THIRD CLAIM FOR RELIEF
### (Unjust Enrichment)
### (On Behalf of the Class)

93. Plaintiffs incorporate the preceding allegations by reference as if fully set forth herein.

94. Plaintiffs (on behalf of themselves and the Class) assert a common law claim for unjust enrichment. This claim is brought solely in the alternative and Plaintiffs concede that this claim cannot survive if their contractual claims succeed. If, however, the parties' contracts are deemed unconscionable or otherwise unenforceable for any reason, unjust enrichment will dictate that Arvest disgorge all improperly assessed overdraft fees.

95. By means of Arvest's wrongful conduct alleged herein, Arvest knowingly assessed fees upon Plaintiffs and the members of the Class that are unfair, unconscionable, and oppressive.

96. Arvest knowingly received and retained wrongful benefits and funds from Plaintiffs and the members of the Class. In so doing, Arvest acted with conscious disregard for the rights of Plaintiffs and the members of the Class.

97. As a result of Arvest's wrongful conduct as alleged herein, Arvest has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and the members of the Class.

98. Arvest's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

99. Under the common law doctrine of unjust enrichment, it is inequitable for Arvest to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of overdraft fees on Plaintiffs, Class Plaintiffs, and members of the Class in an unfair, unconscionable, and oppressive manner. Arvest's retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

100.   The financial benefits derived by Arvest rightfully belong to Plaintiffs and the members of the Class. Arvest should be compelled to disgorge in a common fund for the benefit of Plaintiffs the and members of the Class all wrongful or inequitable proceeds received by them. A constructive trust should be imposed upon all wrongful or inequitable sums received by Arvest traceable to Plaintiffs and the members of the Class.

101.   Plaintiffs and the members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the Class demand a jury trial on all claims so triable and judgment as follows:

1.   Certification of the Class under Rule 23;

2.   Restitution of all monies lost by Plaintiffs and the Class as a result of the wrongs alleged herein in an amount to be determined at trial;

3.   Disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

4.   Actual damages in an amount proven at trial;

5.   Punitive and exemplary damages;

6.   Pre-judgment interest at the maximum rate permitted by applicable law;

7.   Reimbursement of all fees, expenses, and costs of Plaintiffs in connection with this action, including reasonable attorneys' fees pursuant to applicable law; and

8.   Such other relief as this Court deems just and proper

Dated:  March 8, 2018.

Respectfully submitted,

BY:    WATSON BURNS, PLLC

/s/ *William F Burns*

William F. Burns (Ark. Bar No. 2008019)
253 Adams Avenue
Memphis, Tennessee 38103
(901) 529-7996
fwatson@watsonburns.com

Jeffrey Kaliel*
KALIEL PLLC
1875 Connecticut Avenue NW
10th Floor
Washington, DC 20009
(202) 350-4783
jkaliel@kalielpllc.com

E. Adam Webb*
WEBB, KLASE & LEMOND, LLC
1900 The Exchange, S.E.
Suite 480
Atlanta, Georgia 30339
(770) 444-0773
Adam@WebbLLC.com

*Attorneys for Plaintiffs*

* *Pro hac vice* application to be promptly filed